# United States Court of Appeals
## For the First Circuit

Nos. 05-1526, 05-1588

IN RE NEW SEABURY COMPANY LIMITED PARTNERSHIP,
Debtor,

NEW SEABURY COMPANY LIMITED PARTNERSHIP,

Appellant, Cross-Appellee,

v.

NEW SEABURY PROPERTIES, LLC,

Appellee, Cross-Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

John J. Monaghan with whom Lynne B. Xerras, Diane N. Rallis, Esme B. Caramello and Holland & Knight, LLP were on brief for appellant, New Seabury Company Limited Partnership.
Daniel E. Rosenfeld with whom David M. Glynn, Robert N. Michaelson and Kirkpatrick & Lockhart LLP were on brief for appellee, New Seabury Properties, LLC.

June 7, 2006

**CAMPBELL, Senior Circuit Judge.**  The parties in this case have brought what are effectively cross-appeals from an order of dismissal entered by the United States District Court for the District of Massachusetts on March 23, 2005 ("2005 District Order", affirming the July 20, 2004 decision of the United States Bankruptcy Court on second remand from the district court.

The dispute is between New Seabury Company Limited Partnership (the "Debtor") and New Seabury Properties, LLC ("NSP") over the Debtor's claim to a share of funds in the Debtor's general operating account ("Operating Account") following the Debtor's declaration of bankruptcy and the entry of a Stipulation between the parties allowing the Debtor to retain the real estate brokerage segment of the business while turning over its other assets to NSP.

## Procedural Background and Facts

The Debtor filed a Chapter 11 petition on March 31, 1997 pursuant to 11 U.S.C. §§ 1101 et seq. It owned and operated a 2000-acre planned resort community in Mashpee, Massachusetts, known as "New Seabury Resort." The Debtor's business was made up of three interrelated divisions: the Recreation Division, the Hotel Division, and the Real Estate Division. The funds relative to the divisions were commingled in the Debtor's single operating account. The functions of the three divisions were as follows:

-2-

The Recreation Division maintained and operated two golf courses and a golf club house, a tennis facility, a beach club, and a swimming pool facility.

The Hotel Division managed and maintained a hotel facility using Debtor and third-party-owned property for short term rental by guests of the New Seabury Resort.

The Real Estate Division operated a real estate brokerage (the "Brokerage"). The Brokerage operated one real estate company, New Seabury Real Estate, that sold Debtor and non-Debtor property on the New Seabury Resort and another real estate company, Sound Realty, that brokered short-term and long-term rentals of property for private individuals within New Seabury Resort. Commissions provided the Brokerage's primary source of revenue. The Brokerage was never a member of the Multiple Listing Service ("MLS") and, as the exclusive broker, sold most of the property in New Seabury. MLS brokers not related to the Brokerage sold a small percentage of the property; the Brokerage and unrelated MLS brokers would share some sales.

During the bankruptcy proceedings, the Debtor and NSP offered competing plans for reorganization of the Debtor. On May 15, 1998, the bankruptcy court entered an Order and Preliminary Decision stating that the Debtor's plan was not confirmable, but NSP's was. For two days leading up to the confirmation hearing on May 29, 1998, the Debtor and NSP engaged in negotiations to resolve the

differances between their competing plans. Ultimately, on May 29, the parties executed a stipulation (the "Stipulation"), pursuant to which the Debtor withdrew its own plan for reorganization.

The Stipulation noted that NSP's plan, to which the Debtor now consented, provided for NSP to acquire substantially all of the Debtors' assets.  So as to resolve the parties' controversy, however, the Debtor and NSP stipulated that "certain assets of the Debtor will not be acquired by NSP and will be retained by the Debtor free and clear of all liens, encumbrances, claims and interest."   Thus, paragraph 9 of the Stipulation provided that "[t]he real estate brokerage segment of the Debtor's business, including all licenses and permits required to operate that segment of the business, shall be retained by the Debtor." Paragraph 10 of the Stipulation went on to state that the parties would execute on the plan's effective date (the "Effective Date") an agreement containing "the following provisions, and failing the execution of such agreement the provisions as set forth herein shall constitute such agreement."

Clauses a, b, and c of paragraph 10 then provided that the Debtor, A + C Great Island, Inc., and Christopher Burden would retain a non-exclusive license to use the requested trade name "New Seabury' in connection with real estate brokerage operations conducted by one or more of them for as long as Burden or his family maintained a majority ownership interest or were involved in

-4-

daily operations. The license would include the right to use the New Seabury name in marketing materials. Additionally, the Brokerage operations were to have access to all resort amenities, including related pictures and information, in its marketing and other material for viewing and touring, with specified free membership rights to be granted to Christopher and Nancy Burden in the New Seabury Club. Non-exclusive signage rights were also granted to the Brokerage operations relating to real estate service operations in NSP's post-confirmation New Seabury related property, with various limitations spelled out as to the form and location of the signage, its acceptability to the Debtor and NSP, and changes desired by NSP.

Paragraph 11 of the Stipulation also contained details and limitations relative to the retained Brokerage operation. The Debtor would retain certain specified real property on which real estate service operations are conducted, including the main New Seabury real estate office and adjacent parking facilities, and certain other parcels. On and for a two-year period following the Effective Date, the Debtor was to allow NSP use of three desks on one of these parcels rent-free, along with certain spelled-out rights to install phone lines and place its own reasonable office equipment. Properties to be retained by the Debtor were to be free and clear of all liens, encumbrances, claims and interests with

-5-

additional conditions specified as to a particular note held by Burden and a mortgage on one parcel.

Paragraph 12 of the Stipulation provided for execution by the parties of a limited non-competition agreement prohibiting NSP and its assignees, successors, and assigns from engaging in real estate brokerage within New Seabury, except as to its own properties, and the Debtor, A + C Great Island and Burden from engaging in resort operations within the boundaries of the New Seabury development and within a three-mile radius. Nothing, however, was to prohibit NSP from employing a broker of its choice to market its properties.

Paragraph 13 specified that "except as provided herein and except as to the obligations of NSP under the NSP Plan," all parties "shall be deemed to have remised, released and forever discharged against the other any and all debts, demands, obligations, avoidance actions, causes of action and any other" claims, through the Effective Date of the NSP plan.

The remaining paragraphs of the Stipulation dealt with the discharge of debts, providing, inter alia, that NSP did not release its debts against the Debtor and that Burden released certain of his debts.

Nothing was said in the Stipulation as to retention or ownership of monies held in the Debtor's operating account. In particular, there was no reference to the disposition of any sums therein derived from real estate brokerage activities.

-6-

At a hearing, the bankruptcy court confirmed NSP's plan and entered a formal order on June 15, 1998 (the "Confirmation Date"). After the Confirmation Date, the Debtor continued to operate the Brokerage.

During the preparation of the documents to close the transaction transferring the bulk of the Debtor's assets to NSP, a dispute arose regarding whether the Debtor was entitled to receive and retain the net cash the Brokerage had generated through the Effective Date of NSP's plan (the "Disputed Funds"). As noted, revenue from the Brokerage operations was commingled with that from the Debtor's two other divisions in a single Operating Account.

In order to complete the closing, the documents specifically excluded the Disputed Funds pending resolution of the parties' rights (the specific language is quoted below). The parties executed the final closing documents on September 17, 1998 (the "Closing"), which was also the Effective Date of the reorganization plan. The bill of sale provided that the Debtor agreed to sell all of the Debtor's rights and title but specifically excluded:

> (i) any assets being retained by New Seabury Company Limited Partnership pursuant to the Stipulation Relating to Competing Plans of Reorganization, Objections to Confirmation, Motion for Reconsideration and Motion for Plan Partnership, entered into on May 29, 1998 (the "Stipulation"); (ii) telephone number (508) 477-9400 pending a further determination of the Debtor's right to retain that number; and (iii) property, assets and rights, generated by or associated with the Seller's Real Estate Brokerage Operations (the "Brokerage Operations") including net cash generated by the Brokerage Operations from January 1, 1998 through September 16, 1998 in the

-7-

amount of $553,762.00, as estimated by the Seller which amount shall remain in the Debtor's account in its entirety until such time as the Court adjudicates the rights of the Seller and NSP thereto, or until further agreement of the parties, and any Purchased Assets described on Schedules "B," "C," "D" and "E" hereto).

After the Closing, the Debtor retained the desks, computers, fixtures, independent contractor agreements, marketing materials, furniture and other equipment at the Brokerage. Pursuant to the Stipulation, the Debtor retained the real property in which the Brokerage conducts business.

NSP moved for an order to compel the Debtor to transfer the Disputed Funds. The Debtor resisted, contending that the Disputed Funds were an asset of the Brokerage which, under the terms of the Stipulation, it was entitled to retain. It insisted that brokerage-related revenues kept in the Operating Account went to the Debtor by implication under paragraph 9 of the Stipulation, which allowed the Debtor to retain "the real estate brokerage segment of the Debtor's business." NSP responded that the Stipulation made no reference to retention by the Debtor of any portion of the Operating Account, hence the Disputed Funds belonged to NSP.

## A. The Bankruptcy Court's First Order

The bankruptcy court agreed that the language of paragraph 9 did not permit the Debtor to retain any portion of the Operating Account, hence the Disputed Funds became the property of NSP. In its March 11, 1999 Order on the case, the bankruptcy court analyzed

-8-

paragraph 9 of the Stipulation and the Bill of Sale and concluded

that the two documents could not "be read to transfer or permit the

Debtor to retain any portion of the General Operating Account."

Paragraph 9 of the Stipulation reads:

> The real estate brokerage segment of the Debtor's
> business, including all licenses and permits required to
> operate that segment of the business, shall be retained
> by the Debtor.

The pertinent part of the subsequent Bill of Sale reads:

> [T]he Purchased Assets conveyed to New Seabury
> Properties, LLC shall specifically exclude (i) any assets
> being retained by New Seabury Company Limited Partnership
> pursuant to the Stipulation Relating to Competing Plans
> of Reorganization, Objections to Confirmation, Motion for
> Reconsideration and Motion for Plan Modification between
> New Seabury Properties, LLC and New Seabury Company
> Limited Partnership, entered into on May 29, 1998 (ii)
> telephone number (508) 477-9400 pending a further
> determination of the Debtor's right to retain that number
> and (iii) property, assets and rights, generated by or
> associated with the Debtor's Real Estate Brokerage
> Operations including net cash generated by the Brokerage
> Operations from January 1, 1998 through September 16,
> 1998 in the amount of $553,762, as estimated by the
> Seller which amount shall remain in the Debtor's account
> in its entirety until such time as the Court adjudicates
> the rights of the Seller and NSP thereto, or until
> further agreement of the parties . . . .

The bankruptcy court wrote:

> 3.    The   Bill   of   Sale   dated   September   5,
> 1998 . . . provides in pertinent part as follows:
>
>> [T]he Purchased Assets conveyed to New Seabury
>> Properties,    LLC   shall   specifically
>> exclude . . . (iii) property, assets and
>> rights, generated by or associated with the
>> Debtor's Real Estate Brokerage Operations from
>> January 1, 1998 through September 16, 1998 in
>> the amount of $553,762, as estimated by the
>> Seller which amount shall remain the Debtor's

> account in its entirety until such time as the
> Court adjudicates the rights of the Seller and
> NSP thereto, or until further agreement of the
> parties . . .

> 4. Paragraph 9 [of the Stipulation] [*supra*] . . . cannot
> be read to transfer or to permit the Debtor to retain any
> portion of the General Operating Account.

The bankruptcy court found that "[b]ased on the language of the May 29th Stipulation and the Bill of Sale, the Disputed Funds are property of NSP and NSP is entitled to possession thereof." The Debtor appealed to the district court from the bankruptcy court's Order.

## B.  The District Court's First Order on Appeal

The district court, in its October 21, 1999 Memorandum & Order, concurred with the bankruptcy court that the contract documents were unambiguous[1] but read the contract language as mandating a different outcome from that reached by the bankruptcy judge. Analogizing the situation to the construction of wills, the district court noted that

> [c]ourts have consistently concluded that a business
> cannot be considered separately from the funds used to
> run it . . . . I see no reason to come to a contrary
> conclusion in respect of the brokerage operations here.
> Its cash assets were part of the business and, as in any
> business, are necessary to keep it operating.

The district judge looked to the language in paragraph 9 of the Stipulation providing for retention of the Brokerage segment of the

---

[1]Neither party contends that the Stipulation (or other relevant contract document, if any) is ambiguous. We see no occasion, therefore, to pass on that possibility, and do not do so.

-10-

business, including all licenses and the permits required to operate that segment, and found that the list was "an inclusive, rather than exclusive matter." He stated that it was "improbable that the licenses and permits were the only assets" retained by the Debtor and that the "term brokerage operations itself indicates that at least those assets essential to running the operations should be retained" by the Debtor. He held that the cash assets of the Brokerage were part of the business and were necessary to keep the business operating, but specifically did not "reach the issue as to whether any of the funds in the [Operating] [A]ccount were truly attributable to the [Brokerage]." The district court's Order remanded the case and directed the bankruptcy court "to determine the amount of cash in the general operating account which is attributable to the brokerage operations."

## C.  The Bankruptcy Court's Order on the First Remand

On remand, the bankruptcy court conducted a three-day trial. It concluded first that the calculations of the amount in the fund were to begin on January 1, 1998. Determination of the amount to which each of the parties was entitled required consideration of three elements: the total amount of Disputed Funds; the application of real estate credits given to parties who bought real estate through the Brokerage; and the application of certain other costs, which are discussed below.

-11-

In a pretrial stipulation in the bankruptcy court, entered into prior to the hearing on remand, the parties had agreed that the maximum amount of the Disputed Funds that the Debtor could recover was the net revenue that the Brokerage earned from January 1, 1993 until September 18, 1998, or $479,457, and that the amount inclusive of the Credits and Charges would be $55,670.

The Debtor offered parties that purchased real estate through the Brokerage a "credit" (the "Credit" or the "Credits"). The purchasers of the property could apply the Credit towards the initiation fee required of new members to join the New Seabury Country Club (the "Club"). The Recreation Division ran the Club. Membership in the Club enabled a member to use its facilities, including the golf courses. The amount of the Credit was a percentage of the commission and could be applied towards the initiation fee for as long as the homeowner remained a property owner at New Seabury Resort. Credits exercised during the relevant period totaled $298,866.

The "real estate carrying costs" (the "Charges") were costs associated with unsold property of the Debtor such as landscaping costs, depreciation and condo fees. The unsold properties themselves were placed under control of the Hotel Division and used as short term rentals. The parties agreed in the pretrial stipulation that for the period of January 1, 1998 to September 17, 1998, the Charges totaled $124,921.

-12-

The Debtor historically maintained consolidated financial statements for all of its revenue producing entities, including New Seabury Real Estate, Sound Realty, and the Club. When homeowners utilized the Credits and joined the Club, the Debtor recorded the total amount of the initiation fee, including the Credit, as income to the Resort Division. The Debtor recorded the amount of the Credit as an expense to the Real Estate Division at the time of its exercise. The Charges were also treated as an expense of the Brokerage. The bankruptcy court held that, treating the Brokerage as a separate entity, the historic treatment of the Credits and Charges was inappropriate to its determination. It adopted testimony from expert witnesses as to applicable accounting principles and concluded that "the Recreation Division would have recorded both the income and expense of the Credit and, in essence, recorded the transaction as a reduced price sale," and that the Charges were "properly attributable to the Hotel Division for the Charges bore no relationship to the Brokerage." The bankruptcy court ultimately concluded that the Debtor was entitled to the entire $479,457 of the Disputed Funds.

A second appeal to the district court followed.

## D. The District Court's Second Order and Remand

In its March 5, 2004 Memorandum & Order, the district court reaffirmed its earlier ruling that cash in the Operating Account attributable to the Brokerage operation formed a part of the

-13-

Brokerage segment of Debtor's business which the Debtor was allowed

to retain under the Stipulation. However, it was unsatisfied with

the accounting rationale accepted by the bankruptcy court based

upon a methodology not historically followed in the Debtor's own

consolidated financial statements. Accordingly, it remanded for

recalculation of the sums applicable to the brokerage segment, the

recalculation to be based on the original accounting methodology,

see supra. The court suggested this would lead the parties to the

$55,970 figure earlier stipulated to in the bankruptcy court or to

$83,846, the net income of the Real Estate Division reflected in

earlier accounting statements.

In once again grappling with the case, the district court also

noted its own dissatisfaction with its earlier rationale for

concluding that cash traceable to real estate brokerage operations

should be treated as a part of the retained assets to which the

Debtor was entitled. The district court wrote:

Further reflection has persuaded me that this case law
[i.e., that resting on testamentary dispositions of
businesses] is not fully sufficient to support my earlier
conclusion.    Wills   involve   different    modes   of
construction than arm's-length commercial transactions,
let alone settlements in bankruptcy proceedings, because
the relationships between the parties, the ultimate goals
of the instruments, and the interpretive goals of the
court differ . . . .    In sum, courts are likely to
construe a bequest generously, because the testator
manifestly sought to give something of value to a worthy
beneficiary, and because any verbal missteps in the will
are neither the beneficiary's fault, nor errors against
which   the   beneficiary   could   have   protected
himself . . . .   A Chapter 11 bankrupt cannot fairly
claim the benefits of this analogy; it is, after all, not

-14-

a deserving child inheriting the family business, but rather an insolvent permitted to remain in business for the benefit of creditors. Nevertheless, the bankruptcy court should treat the writings surrounding a reorganization with an eye toward the equities of reorganization.

The district court went on to affirm its conclusion that the term "business" in the Stipulation necessarily included cash by reference to other modes of analysis, including contract interpretation, but noted that it was essentially performing a "functional analysis of the parties' arrangement."

While it acknowledged that the relevant documents did not explicitly mention cash as among the assets to be retained by the Debtor and that "[a] reading of the Stipulation that excludes cash might be consistent with the absence of a negotiated cash valuation method, and the bankruptcy context in which the primary goal is to pay back the Debtor's creditors," the district court nonetheless concluded that "the loss should lie with NSP, because it was in a better position to protect its interests by writing more detailed contractual language, and because its theory of the limits of a 'business' does not lead to a coherent resolution." The court additionally noted that:

[t]he general rubrics for construction of analogous writings do not provide a full answer to the question. Nor does general business practice. A business may be conveyed in a variety of states -- all assets, all assets except cash, all nonliquid assets, goodwill and intellectual and real property only, goodwill only, and so on -- and therefore the answer must necessarily turn on the degree that any default position has been refined. In this context, the Debtor draws a simple and coherent

-15-

line: a 'business' includes all its assets unless stated
otherwise.   NSP, having asserted that the line actually
falls somewhere inside the set of business assets, must
provide a logical place in which to draw it, but has not
done so.

On the issue of the proper way to account for the cash it
found Debtor was entitled to retain, the district court noted that
while historically, the Debtor had recorded the initiation fee at
the country club as income to the Recreation Division, it had
recorded the amount of the credit as a loss to the Real Estate
division. In August 1998, after the Stipulation had been executed
and the plan had been confirmed, the Debtor's principal,
Christopher Burden, told his accountant to "rework the figures for
the Real Estate Operations." The new accounting treated initiation
fee credits as losses to the Recreation Division, not the Real
Estate Division. The effect of this new accounting system was to
increase the net income of the Real Estate Division on the
consolidated financial statements.

The district court concluded that, under its new analysis
based on the parties' intent to form a contract, it was only
permissible for NSP to be found to have assented to the terms of
the bargain it could reasonably foresee. The district court
observed that NSP could not have foreseen the Debtor's change in
accounting methodology: "It is one thing for a court to hold NSP
to the reasonably foreseeable consequences of its ill-defined
bargain with the Debtor; it is quite another for the court to hold

-16-

NSP to terms that could not possibly have been on the table." The district court thus vacated the bankruptcy court's calculation of the cash attributable to the Debtor and remanded for a recalculation under the original accounting methodology.

The district court concluded:

> If by March 22, 2004, the parties are unable to agree upon a stipulated figure, I will remand to the Bankruptcy Court to determine the amount of cash attributable to the brokerage, using, January 1, 1998 as a start date, but applying the accounting methodologies employed by the Debtor on the date the Plan was confirmed. [footnote 13] The parties shall file a status report by no later than March 24, 2004 regarding the issues to be resolved. In all other respects, the decision of the Bankruptcy Court is AFFIRMED.

In the cited footnote, the district court stated:

> I assume that the parties or the Bankruptcy Court will naturally gravitate towards either the $55,670 figure in the parties' joint pretrial stipulation, or $83,846, the net income of the Real Estate Division reflected on Debtor's financial statements, which treated both the real estate credits and the carrying costs as losses to the Real Estate Division. However, the parties and, if necessary, the Bankruptcy Court are free to determine the appropriate number under the former methodology based on an independent review of the financial data. If the parties are unable to agree, the Bankruptcy Court may, but need not, receive new evidence beyond what has already been presented to it.

The parties' status report indicated that:

> In light of footnote 13 of the Memorandum and Order, NSP offered to stipulate to the $55,670 figure in the parties' join pretrial stipulation. Debtor responded that there was no figure within the range described in footnote 13 of the Memorandum and Order to which it would stipulate. Debtor did not provide a figure to which it was willing to stipulate.

**E.   The Bankruptcy Court's Order on Second Remand**

-17-

On remand, the bankruptcy court, "mechanically applying the accounting principles historically used by Debtor," held that the Debtor was entitled to $55,670 of the Disputed Funds. The district court affirmed that order, and both parties appealed to this court.

## Discussion

NSP in its cross-appeal argues that the district court erred in reversing the bankruptcy court's initial ruling that the Debtor was not entitled to any portion of the Operating Account, hence could receive no part of the Disputed Funds. Understandably, the Debtor sees no virtue in the initial bankruptcy court's rejection of its claim to funds in the Operating Account, and asks us to uphold its retention of $479,457 as found by the bankruptcy court on the first remand. The Debtor urges that the district court later erred both in altering its own analysis after the first remand to limit recovery to the Debtor's historic accounting principles and in suggesting the much lower range of totals from which the bankruptcy court was to choose.

NSP responds that if we find the Debtor is owed some portion of the cash in the operating account, it should be the lowest possible amount.

While the issue is somewhat close, we incline towards the bankruptcy court's original finding denying to the Debtor retention of any of the funds in the Operating Account. The plain language of the Stipulation and the fact that this transaction occurred in

-18-

the context of a bankruptcy, not a traditional commercial sale, among other reasons, support this conclusion. Accordingly, we hold that the Debtor is not entitled to receive any portion of the Disputed Funds.

## A. Standard of Review

The bankruptcy and district courts' rulings regarding the Debtor's entitlement under the Stipulation to the funds in the Operating Account are matters of law reviewed de novo, and any findings of fact made by the bankruptcy court are reviewed for clear error. In re LaRoche, 969 F.2d 1299, 1301 (1st Cir. 1992). This Court "'cede[s] no special deference to the district court's initial review'" in examining a bankruptcy court's decision on appeal. In re Merrimac Paper Co. v. Harrison, 420 F.3d 53, 58 (1st Cir. 2005) (quoting In re Bank of New Engl. Corp., 364 F.3d 355, 361 (1st Cir. 2004)). Rather, we review directly the bankruptcy court's determination. Id.

## B. Why the Debtor may not Retain Cash from the Operating Account

Preliminary to the issue of how much money might have been due the Debtor is whether the Debtor is due any money at all. As noted, NSP now argues that the district court erred both in its 1999 order when, using testamentary bequest analysis, it reversed the bankruptcy court's initial conclusion that the contract documents between the parties could not be read to leave any money from the operating account in the hands of the Debtor, and again in

-19-

2004 when it reaffirmed its theory underlying its 1999 Order but applied a "functional" analysis which concluded that NSP was more capable of looking out for its interests than was the Debtor and thus was required to bear the loss. NSP argues that the district court's approach ignores the standard principles of contract interpretation.

The Debtor, of course, agrees with the district court's reversal of the bankruptcy court's original ruling but not with its revised order regarding accounting. For the reasons explained below, we agree with the bankruptcy court that, under the language of the Stipulation and accompanying documents, the Debtor is not entitled to any of the cash in the Operating Account.

A plan of reorganization is a binding contract between the debtor and the creditors and is subject to the general rules of contract construction and interpretation. See In re Sergi, 233 B.R. 586, 589 (1st Cir. 1999). Likewise, stipulations entered into between parties are treated as contractual and are subject to the principles of contract interpretation. Gomez v. Rodriguez, 344 F.3d 103, 121 (1st Cir. 2003); TI Fed'l Credit Union v. DelBonis, 72 F.3d 921, 928 (1st Cir. 1995).

There were four documents related to the ownership of the funds in the Operating Account: NSP's plan, the Stipulation, the Confirmation Order, and the Bill of Sale. As set forth in NSP's plan as affirmed in the Confirmation Order,

-20-

On the Effective Date the Debtor shall close the Sale
Event by conveying to NSP all of the Debtor's right,
title and interest in and to the Purchased Assets
(exclusive of the Assets to be left with the Debtor under
the Stipulation).

NSP's plan also provided that "[N]SP shall have the right not to
take title to any Asset . . . ." The language in the plan and
Confirmation Order indicates that any right the Debtor has to any
assets would be determined by reference to the Stipulation.

In support of the initial ruling of the bankruptcy court
rejecting the Debtor's claim to cash, NSP argues that the
Stipulation itself makes no provision for the Debtor to retain any
portion of the Operating Account. It is true, as the Debtor
emphasizes, that paragraph 9 of the Stipulation reads:

9    The real estate brokerage segment of the Debtor's
business, including all licenses and permits required to
operate that segment of the business, shall be retained
by the Debtor.

However, the paragraphs immediately following describe in
considerable detail what assets within the real estate brokerage
segment, beyond licenses and permits required to operate that
segment, are to be retained by the Debtor -- and nowhere, either in
paragraph 9 itself or thereafter, is reference made to any cash in
the Operating Account. Paragraphs 10 and 11 read as follows:

10.   NSP and the Debtor shall, on the Effective Date of
the NSP Plan, execute an agreement in a form reasonably
acceptable to NSP and the Debtor, binding on each
parties' successors and assigns, containing the following
provisions, and failing the execution of such agreement
the provisions as set forth herein shall constitute such
agreement:

-21-

a. The Debtor, A&C Great Island, Inc., and Christopher Burden shall have and retain, or receive for nominal consideration, a non-exclusive license to use the registered trade name "New Seabury" in connection with real estate brokerage operations conducted by one or more of them, which license shall continue for as long as Christopher Burden or any member of his family maintain a majority ownership interest in or is involved in daily operations of such business. The license shall include a license to use the New Seabury name in marketing material.

b. The brokerage operations will have access to all resort amenities and may include pictures and information regarding the resort amenities in its marketing and other material for viewing and touring. Christopher and Nancy Burden will be afforded full membership rights in the New Seabury Club at no cost for as long as Mr. Burden has a majority ownership interest in or participates in daily operations of the brokerage operations, or for as long as either Mr. Burden or Mrs. Burden reside at New Seabury.

c. The brokerage operations will have the non-exclusive right to place reasonable temporary signage (e.g. open house signs) and permanent signage relating to real estate service operations on NSP's post-confirmation New Seabury related property. The permanent signage shall be where presently located and shall be in its present form, or in a form reasonably acceptable to the Debtor and NSP, provided however, that NSP may change the permanent signage so long as such signage is of equal visibility.

11. Real property on which the real estate service operations are conducted, including and limited to, the main New Seabury real estate office and the adjacent parking facilities, the Popponessett Real Estate Parcel as identified in the Debtor's Plan and the parcel at the Mashpee Rotary on Routes 28 and 151 referred to as the Sound Realty Parcel shall be retained by the Debtor. The Debtor shall, on and for a two-year period following the Effective Date, afford NSP use of three desks at the Sound Realty location rent-free. NSP may, at its sole option and expense, install its own phone lines and place its own reasonable office equipment, including a facsimile and copy machine in the Sound Realty property for as long as it has the right to utilize that property. Except as provided herein, the properties retained by the

-22-

Debtor shall be free and clear of all liens, encumbrances, claims and interests. NSP shall have no obligation to the Debtor, Burden, or any affiliates with respect to the Sound Realty Parcel, the New Seabury Real Estate Office, or the Popponessett Real Estate Parcel, including, without limitation, the note held by Christopher Burden in the original principal, except for the existing mortgage lien on the Popponessett Real Estate Parcel, which mortgage will be paid in accordance with the NSP plan.

As noted, the Stipulation makes no reference to the retention by Debtor of any portion of the cash held in the Debtor's Operating Account. The Real Estate Division maintained no bank account of its own. All the cash attributable to the three operating divisions was held in the Debtor's single operating account, where they were commingled. One would expect, if the parties to the Stipulation had intended the Debtor to retain up to $500,000 from the commingled operating account, that they would have said so. Especially would this be expected in a Stipulation settling a bankruptcy which specifies in detail the other real estate Brokerage assets of significance that were to be retained by the Debtor. The need to specify a considerable sum of cash, if it was to be retained, would have seemed especially obvious in this context not only because sums allocable to the real estate Brokerage were commingled with cash from elsewhere, but because a complicated system of credits and charges relative to real estate commissions, implicating all three divisions, made it difficult to ascertain what net sums were fairly attributable to the Brokerage segment of the business. Historically, some of the credits and

-23-

charges were treated so as to greatly reduce the sums allocated to the real estate division on the Debtor's consolidated accounts, although in the hearing held after the first remand, the bankruptcy judge was persuaded by accounting experts that a methodology more favorable to Debtor was correct.

In order to allow the Debtor to retain any of the Disputed Funds, a court would have to resolve accounting issues that are less than clear and read language into the Stipulation that does not appear (language suggesting that the Debtor was entitled to some of the funds, or giving a means of calculating the funds to which the Debtor was entitled). Courts will not read language into a contract where it does not appear. See Accusoft Corp. v. Palo, 237 F.3d 31, 41-42 (1st Cir. 2001) (citing Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 855 (1st Cir. 1987)).

The Debtor argues that the phrase "the real estate brokerage segment of the Debtor's business," which paragraph 9 allows the Debtor to retain, implies retention of monies belonging to that aspect of the business. Had the Brokerage segment been more clearly an independent business entity with, for example, its own bank account, it would perhaps be more plausible to infer inclusion of the latter among the retained assets. But the Brokerage "segment" mentioned in paragraph 9 was just that--a segment of the larger business; precisely what assets comprised that "segment" for purposes of this bankruptcy sale was not self-evident but required

-24-

the considerable clarification provided in the latter part of the Stipulation, which describes in detail the various elements to be retained.[2]

Debtor would have it that paragraphs 10 and 11 merely enumerate additional assets to be retained by the Debtor. According to the Debtor, NSP's interpretation does not give adequate meaning to the language of paragraph 9. Debtor argues that paragraph 9 becomes superfluous if paragraphs 10 and 11 are read to specify the assets to be retained by the Debtor, thus violating a common tenet of contract construction: "'every word and phrase of an instrument is if possible to be given meaning, and none is to be rejected as surplusage if any other course is rationally possible.'" FDIC v. Singh, 977 F.2d 18, 22 (1st Cir. 1992) (quoting Tupper v. Hancock, 65 N.E.2d 441, 443 (Mass. 1946)). However, paragraph 9 is not rendered meaningless by NSP's interpretation. Paragraph 9 can be read as an introductory, generalized characterization of the portion of the business the Debtor was to retain, which assets (beyond the licenses and permits expressly referenced in paragraph 9) were then more precisely

---

[2]The district court was persuaded by the "simple and coherent line" drawn by the Debtor, to the effect that "a 'business' includes all its assets unless stated otherwise." See supra. It is notable, however, that what was to be retained here was not the Debtor's "business," as such, but rather the real estate brokerage "segment" of the Debtor's business. It is thus largely irrelevant that had Debtor's entire business been sold or retained, its cash assets might be deemed to be included as part thereof.

explicated in the following paragraphs, especially paragraphs 10 and 11.

We do not agree that the items listed in paragraphs 10 and 11 of the Stipulation can be written off merely as assets that the Debtor received in addition to the "real estate brokerage segment." To the contrary, most of the items later described within paragraphs 10 and 11 would also fit under the general rubric of "the real estate brokerage segment of the Debtor's business." The subsequent specific descriptions in paragraphs 10 and 11 were needed so as to explicate the parties' understanding of exactly what items and rights were to be retained by the Debtor. In arguing the items in paragraph 10 and 11 are mere additions, the Debtor asserts the enumerated real estate parcels in paragraph 11 were not previously used exclusively by the Brokerage division. They had, however, been used in some part by that division. To show the parties' present agreement as to the precise status and use of the parcels, as well as the extent to which they would form a part of the retained segment, it was necessary, as was done, to provide the specifics in paragraph 11. Much the same is true of the cash now in dispute. It is not enough that some of the unmentioned cash in the Operating Account may have derived from past real estate brokerage operations. To show an intention to include that cash as part of the retained real estate brokerage segment, that intention needed to be stated -- and given the

accounting uncertainties, the amount of the cash to be retained needed to be declared -- just as all the other items were listed and specified in paragraphs 10 and 11.

In the circumstances, we think it cannot be inferred simply from the general language in paragraph 9 that the parties meant the Debtor to retain any particular amount of the commingled cash. In a bankruptcy transaction such as this, it would not be at all unreasonable for the parties to have understood that Debtor would receive the right to continue to operate the Brokerage segment without being entitled to retain the cash previously generated by brokerage operations. NSP needed cash assets to perform its obligations to pay off the bankrupt's indebtedness. The Debtor might be thought to benefit sufficiently from the right to operate the real estate segment without receiving all or part of the cash attributable to past operations of that part of the business. Without more specific reference, it is impossible to determine that the parties necessarily meant to permit the Debtor to retain some portion of the Operating Account funds.

As already suggested, some of the current difficulty stems from the fact that "the real estate brokerage segment of the Debtor's business" was not a wholly independent business with its own bank accounts. Precisely what assets were meant to be included within the contours of that phrase were not self-explanatory, making it necessary for the parties to have described with some

-27-

reasonable degree of clarity, the particular items intended to be retained. That description appears principally in paragraphs 10, 11 et seq.

In this respect, a further aspect of the Stipulation should be mentioned. This is the wording at the start of paragraph 10, which declares that NSP and the Debtor shall, on the effective date of the NSP plan, execute a binding agreement containing the following provisions -- provisions which themselves shall constitute such agreement if none is executed. This indication that paragraphs 10, 11 and beyond are to be a separate agreement reinforces the notion that they are to spell out the essential details of the real estate brokerage segment earlier said to be retained. And, indeed, paragraph 10 goes on to specify just such details, delineating items such as the right of the Debtor, A+C Great Island, Inc., and Burden to have and retain a non-exclusive license to use the registered "New Seabury" trade name and marketing materials "in connection with real estate brokerage operations conducted by one or more of them," access to resort amenities and signage, and even maintenance of membership in the New Seabury Club for Christopher Burden and his wife. Given the extent of the detail in paragraphs 10 and 11, the omission therefrom of any reference to the cash in the operating account is highly significant. The parties would scarcely have overlooked mention of inclusion of a substantial share of the commingled cash from the operating account, and the

-28-

amount thereof, had this, too, been part of their completed bargain, especially where it would be unclear simply from the general language in paragraph 9 how much of an uncertain amount of cash Debtor was to retain, if it was to retain any at all.

In addition to the lack of specific reference to the cash associated with the Brokerage segment and absence of any declared method to account for such cash, NSP also relies for a supplemental argument on the maxim <u>expressio unius est exclusio alterius</u>, which mandates that when parties list specific items in a document, any document not so listed is excluded.   <u>Lohnes</u> v. <u>Level 3 Commc'n, Inc.</u>, 272 F.3d 49, 61 (1st Cir. 2001).   The absence of any reference to cash when other items were delineated in paragraphs 10 and 11 indicates, according to NSP, that the cash was not intended to be retained by the Debtor.   The Debtor replies that the use of the word "including" in paragraph 9 does not preclude the Debtor from retaining the cash.   See <u>St. Paul Mercury Ins. Co.</u> v. <u>Lexington Ins. Co.</u>, 78 F.3d 202, 206 (5th Cir. 1996) ("[W]e are not convinced that the rule of <u>expressio unius est exclusio alterius</u> applies in the instant case as the challenged list of provisions in St. Paul's contract is prefaced by the word 'including,' which is generally given an <u>expansive</u> reading, even without the additional if not redundant language of 'without limitation.'").   NSP notes, however, that unlike in the cases relied upon by the Debtor, the word "including" in paragraph 9 is in a separate paragraph from the

-29-

language in paragraphs 10 and 11, thereby limiting the relevance of those cases in the instant situation.  Paragraph 9 can be read as an introductory paragraph referring to the licenses and permits and then leading into the specifics of paragraphs 10 and 11 regarding the shared property that would be retained by Debtor.

The Debtor argues that its position is supported by a review of the associated transaction documents.  In the first exhibit to the Bill of Sale, Schedule A, the assets to be transferred from the Debtor to NSP upon the Closing are described as "all properties, assets and rights of [Debtor] not associated with or generated by the Real Estate Brokerage Operations."  The Debtor claims that cash is one such asset "generated by" the Brokerage Division.  Further, Debtor argues that if it were to retain only a limited set of assets of the Brokerage Division, rather than the entirety of the "real estate brokerage segment," then Schedule F, which sets forth a list of assets that were to be transferred to NSP despite being located in the real estate Brokerage segment's offices, would have been unnecessary.  Moreover, the list of enumerated items in Schedule F including "5 Wastebaskets," "1 Casio Calculator," and "1 Lamp" further suggests that NSP was cognizant of the need to distinguish specific items from the all-encompassing (and thus cash-including language) of the "real estate brokerage segment" language in paragraph 9.

-30-

The Debtor's arguments are not supported by the full language and context of the Bill of Sale. The sentence cited by the Debtor includes a parenthetical specifically noting that the distribution of the cash will be resolved by the court. The complete language in Schedule A provides that "in addition to any assets being retained by [the Debtor] pursuant to the [Stipulation] . . . the Purchased Assets shall not include any personalty located in the real property to be retained by [the Debtor] under the Stipulation unless set forth on Schedule F hereto . . ." (emphasis added). The Bill of Sale recognized that the Debtor would retain only the assets listed in the Stipulation and therefore specified in the Schedule that the Debtor could retain the inconsequential property inside the offices as well.

The Debtor's Schedule F argument likewise seems limited by the fact that Schedule A provides for the retention by the Debtor of the real estate office in which the real estate business is conducted, so that it would have been important for NSP to identify any objects it wished to take from that property. Such specification does not necessarily imply that the parties assumed that larger assets, like the cash, were included in the paragraph 9 reference to the "real estate brokerage segment."

In its reversal of the bankruptcy court's ruling that the Debtor was not entitled to the cash, the district court noted the traditional commercial practice of a seller's retaining the cash

-31-

associated with the business it sells.   It further observed, however, that the instant case is complicated by the fact that it is not a simple commercial transaction but a bankruptcy proceeding. "The interpretation of a stipulated amendment to a bankruptcy reorganization plan must . . . recognize certain concerns lurking in the background:   that creditors be paid; that the debtor be rehabilitated; and that neither the debtor nor any creditor receive a windfall."   Here, NSP assumed the cost of nearly $8 million to satisfy the Debtor's creditors.   It is not unreasonable to read the Stipulation and associated documentation to be maximizing the total transfer of cash assets to NSP while still allowing the Debtor to maintain the real estate Brokerage for future use.   As the district court noted, "a 'segment of . . . business' can be a valuable and coherent asset if limited to goodwill, real property, equipment, and intellectual property needed to operate the business, even without cash."   Additionally, "[a] reading of the Stipulation that excludes cash might be consistent with the absence of a negotiated cash valuation method, and the bankruptcy context in which the primary goal is to pay back the Debtor's creditors."   The district court observed that the Debtor has been able to operate the Brokerage for several years without the use of the Disputed Funds. Christopher Burden put an undisclosed amount of his personal capital into the business.

The district court ultimately concluded that NSP should bear the loss because it was in a better position to protect its assets in the drafting of the Stipulation. We are unable to accept that rationale. Both parties were represented by attorneys. If retention of the cash was an item of importance to the Debtor, it is not unreasonable to believe that it would have sought to negotiate a reference thereto in the Stipulation. We see no unfairness in holding against the Debtor in the absence of such a reference, such absence being indicative that the parties formed no such agreement. While doubtless the bankrupt party was in a weaker negotiating position, that cannot justify rewriting the parties' agreement for presumed equitable reasons.

We believe the bankruptcy court's initial conclusion (and the district court's acknowledgment of the reasoning underlying it) was correct. The plain language of the Stipulation and associated documentation does not support a conclusion that the Disputed Funds or some portion of them were intended to be retained by the Debtor. The funds were in the Operating Account, and the Stipulation provided neither express reference to the cash nor any reference to a method of accounting for the Brokerage's share of the cash. By contrast, paragraph 11 itemizes the real property to be retained by the Debtor which had not been exclusive property of the Brokerage division. The bankruptcy court's conclusion that the Debtor was not entitled to retain the cash is in keeping with the plain

-33-

language of the contract documents and also acknowledges the unique posture of the bankruptcy proceeding which sets this case apart from a traditional commercial transaction.

**Remanded** with directions to affirm the initial judgment of the bankruptcy court and to vacate the contrary judgments of the district court.